468 So.2d 1225 (1985)
LIQUID CARBONIC CORPORATION
v.
BASF WYANDOTTE CORPORATION, et al.
No. CA-2176.
Court of Appeal of Louisiana, Fourth Circuit.
April 1, 1985.
*1226 Robert N. Ryan, Stephen A. Mogabgab, New Orleans, for plaintiff-appellant Liquid Carbonic Corp.
John V. Baus, Madeleine Fischer, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant-appellee BASF Wyandotte Corp.
Robert E. Couhig, Jr., New Orleans, for defendant-appellee Owens-Corning Fiberglass Corp.
Before REDMANN, C.J., and BARRY and KLEES, JJ.
KLEES, Judge.
This appeal stems from a judgment dismissing plaintiff's suit against defendants BASF Wyandotte Corporation and Owens-Corning Fiberglass Corporation. The plaintiff, Liquid Carbonic Corporation, sued BASF Wyandotte and Owens-Corning for damages it sustained when a cold box owned by plaintiff and insulated with materials allegedly manufactured by defendants was destroyed by fire. After a lengthy trial, the lower court found that plaintiff had failed to show: (1) that any insulation made by BASF Wyandotte was actually in the cold box at the time of the fire, and (2) that the Owens-Corning insulation in the *1227 cold box was in any way defective. Plaintiff appeals this ruling, and additionally complains that the trial judge erred by refusing to admit into evidence a Federal Trade Commission consent decree, and by requiring plaintiff to pay certain costs of litigation. We affirm the judgment of the trial court on all three issues, for the following reasons.

FACTS:
Liquid Carbonic is the owner and operator of a plant at Geismar, Louisiana which produces gaseous hydrogen and liquid and gaseous carbon monoxide. Because this production is carried out at very low, or cyrogenic, temperatures, a structure known as a "cold box" is essential to the operation of the plant. In order for the cold box to function properly, many of the pipes and vessels inside it must be insulated.
The cold box, which is approximately twelve feet square and sixty-five feet high, was designed and constructed by a German corporation, Linde A.G., and then shipped to Geismar for assembly. Owens-Corning provided specifications for the original insulation, which was installed by Process Insulators. After the various pipes and vessels were insulated, the box was filled with rock wool and nitrogen.
Shortly after it was first placed into operation in December of 1971, the box began leaking hydrogen and was shut down for repairs. It was put back into operation, and again did not function properly. When it was discovered that its bottom had cracked due to liquification of some of the nitrogen, the cold box was shut down a second time. At this point, Liquid Carbonic held a conference with representatives of Linde A.G., Owens-Corning and others, at which meeting it was decided to re-design the insulation system.
Andrew Kotulski, an engineer with Liquid Carbonic, drew up the specifications for the new insulation system, which called for the pipes and vessels to be insulated with a bun-type urethane that would be attached to the pipes with Crest mastic and sealed with Benjamin Foster mastic as a vapor barrier. In addition, a box of this same bun-type insulation, sealed the same way, was to be built around each valve and then filled with a poured foam insulation manufactured by Cook Paint and Varnish Company. Finally, the cracked floor of the box was to be sprayed with a foam urethane insulation. Allegedly, the bun-type insulation used was manufactured by Owens-Corning and the spray foam was made up of components manufactured by BASF Wyandotte.
Process Insulators began installing the new system in January of 1972, but because of alleged faulty workmanship, was replaced by Anco Insulation, which completed the job. The cold box was once again put into operation, and although it did not function to capacity, it remained in operation until April of 1973, when it was shut down for a two-week "turnaround" or major reconditioning. During this time, the cracks in the original floor were to be patched and a new stainless steel floor installed above the floor beams.
In order to accomplish the reconditioning, the foam insulation originally sprayed on the floor had to be removed. This was done by Petro Corporation, the company in charge of maintenance for the Geismar Plant. Although much of the foam was removed, there were scattered particles remaining on the floor and adhering to the underside of the floor beams. On April 27, 1973, after a Liquid Carbonic process technician issued a "hot work" permit to allow welding to be done inside the cold box, a welder was brought in to patch the floor. He had welded two patches and was attempting to tack an angle iron along one wall, in a confined space underneath one of the vessels, when a fire broke out. Since he was unable to reach the fire and put it out with his hand, the welder left the box and got a dry chemical fire extinguisher. When he realized he was not having any success in putting out the fire with the extinguisher, he abandoned the effort. Despite later efforts to control the flames with a water hose, the fire spread rapidly, *1228 resulting in almost complete destruction of the cold box.

SUFFICIENCY OF EVIDENCE:
The basis of plaintiff's suit is that defendants BASF Wyandotte and Owens-Corning falsely represented their products to be "self-extinguishing" and that, relying on these representations, Liquid Carbonic permitted welding to be done in close proximity to the products without taking precautions against fire. Defendants contend that they did not misrepresent their products, but rather that the products lived up to their rating of "self-extinguishing" under the particular test conditions specified, which should have been familiar to Liquid Carbonic, a sophisticated purchaser. Furthermore, defendants assert that plaintiff failed to take even the minimum fire precautions required by its own safety manual for welding inside a structure such as the cold box, and also that their products burned because Liquid Carbonic installed them in the cold box in conjunction with other, highly flammable materials which ignited first. Finally, defendant BASF Wyandotte denies that its product was present in the cold box at all.
After a full trial on the merits, the trial judge concluded that plaintiff had failed to prove by a preponderance of the evidence that any BASF Wyandotte product was used in the cold box. In addition, the court found that plaintiff had not proven that the Owens-Corning product installed in the box was not, even in the lay sense of the term, self-extinguishing. Finally, the judge found that the fire most likely started by the ignition of a flammable substance other than the Owens-Corning insulation, such as the Cook foam or the Benjamin Foster mastic. After examining the extensive record, we can find no manifest error in the trial judge's conclusions.
The trial judge's conclusion that plaintiff did not prove that BASF Wyandotte foam was actually used in the cold box is well supported by the evidence. Ronald Bourgeois, Anco's general manager, testified that BASF Wyandotte foam was sprayed on the floor of the box; however, because Anco lost its file on the job, there is no documentary evidence to back up Bourgeois' statement. James Donnelly, the man in charge of the Geismar plant for Liquid Carbonic, stated that he couldn't be sure that Wyandotte foam was used; he merely relied on what Anco told him. Mr. Donnelly further testified that Liquid Carbonic did not have an invoice showing the exact brands of insulation used.
BASF Wyandotte does not sell the actual foam insulation itself; rather, it sells chemicals in drums that must be combined by the customer to produce the spray foam. Wyandotte also provides data sheets specifying which chemicals should be used together. The only record Wyandotte has of a sale to Anco during the relevant time period reflects a sale of the chemicals WUC 2047-R and WUC 3012-T. However, Mr. Bourgeois of Anco testified that the foam used in the cold box was composed of WUC 2047-R and WUC 3019-T. A further discrepancy in the evidence was brought out by the testimony of two expert witnesses. Clayton Callihan, a chemical engineer, stated that tests performed on the two types of foam found in the box after the fire revealed that neither foam contained flame retardant chemicals. (Rec.Vol. X, p. 7). Based on this evidence, John Patton, an expert on urethanes, testified that neither foam could have been made with Wyandotte WUC 2047-R, which contains fire retardant polyols.
After the fire, Mr. Donnelly of Liquid Carbonic wrote in his diary and told others that all of the foam in the cold box was made by Cook Paint & Varnish Company. Investigators who went into the cold box after the fire observed two different foams, a yellow foam and a white foam. There were pieces of white foam on the floor and adhering to the underside of the floor beams, suggesting that the foam which had been sprayed on the floor was white. The evidence further shows that Owens-Corning foam is yellow, Cook foam is white, and any of the possible Wyandotte foams would be tan. However, of all the witnesses who testified, only Mr. Donnelly *1229 of Liquid Carbonic saw any tan foam on the floor of the cold box.
In review of these glaring discrepancies in the evidence, we find, as did the trial judge, that Liquid Carbonic did not prove by a preponderance of the evidence that BASF Wyandotte foam was in the box at the time of the fire.
As to the claim against Owens-Corning, although Owens-Corning insulation was in the box, plaintiff failed to prove that it was not self-extinguishing or that it was defective in some manner that contributed to the fire. The data sheet provided by Owens-Corning to purchasers of its foam insulation described the insulation as being "self-extinguishing when tested in accordance with ASTM [American Society of Testing Materials] D-1692." Under the test procedure, a small sample of material (2" × 6" × ½") is held in a horizontal plane over a bunsen burner flame for a period of sixty seconds. After the flame is removed, the degree to which the material continues to burn before it self-extinguishes is measured. If the sample stops burning within a given time and does not burn past a gauge mark made on it, it is rated as self-extinguishing according to the test, and the time and extent of the burn is given. The test standards specifically state that the test cannot be applied to materials which do not burn, and that the test is useful only to establish relative burning characteristics and should not be used as a criterion for evaluating fire hazard. Several witnesses testified that a sophisticated user, such as Liquid Carbonic, would be aware of the limitations of ASTM ratings and would know that it was necessary to look up the test specifications in order to understand the exact significance of the rating given. In fact, Andrew Kotulski, the Liquid Carbonic engineer who drew up the specifications for the reinsulation of the cold box, testified that he knew what the ASTM standards were.
Three experts performed flammability tests on samples of foam removed from the cold box. Dr. Gerald Whitehouse of Louisiana State University did convection, conduction and open flame tests on two samples of foam, one yellow and one white, taken from the box after the fire. In all three tests, the yellow foam self-extinguished, but the white foam was completely consumed. Similarly, Charles Parish of Haag Engineering Company tested two samples of foam given to him and found that the tan or yellow foam was self-extinguishing when a sample 1" × 6" × ½" was placed horizontally over a flame, but burned when placed vertically over the flame. The other foam, which was white, burned in both cases. A final test was done by Richard Lindstrom, a chemical engineer, who found that a sample of yellow foam virtually identical to that used in the box was self-extinguishing even when held vertically over a flame.
Therefore, according to all three experts, the yellow Owens-Corning foam was indeed self-extinguishing, i.e., it only burned as long as an external flame source was present, at least under the test conditions. Based on this evidence, we conclude, as did the trial judge, that plaintiff failed to prove that the Owens-Corning product was not self-extinguishing.
Moreover, the evidence clearly shows that at no time did anyone from Liquid Carbonic actually consult or rely upon the Owens-Corning product information regarding flammability of the urethane. Mr. Donnelly and Mr. Kotulski of Liquid Carbonic both testified that flammability was not a consideration when the types of insulation were chosen for the cold box; rather, they were concerned only with the cryogenic properties of the insulation. This testimony was confirmed by Alistair Munro of Lotepro Corporation, a subsidiary of Linde, A.G., who also attended the meeting at which it was decided to reinsulate the cold box. Furthermore, Bobby Gene Sims, the Geismar plant manager, stated that he didn't check as to the flammability characteristics of the insulation before allowing welding in the cold box because he thought the insulation wouldn't burn and because he had other things to do at the time. Liquid Carbonic cannot complain *1230 that the flammability characteristics of the insulation were misrepresented unless it actually relied on the information given.
Another reason that Liquid Carbonic failed to prove its case against Owens-Corning is that a Liquid Carbonic engineer designed the insulation system for the cold box and chose to use highly flammable materials in conjunction with the Owens-Corning foam. It is undisputed that Mr. Kotulski of Liquid Carbonic drew up the specifications for the reinsulation job and that both he and Mr. Donnelly knew that the Cook Paint and Varnish foam, which was poured around the valves, was highly flammable. Moreover, the evidence clearly showed that Mr. Kotulski's selection of Benjamin Foster Mastic for use as a vapor barrier was improper and probably contributed significantly to the fire. The data sheet on the particular mastic used states that the mastic produces a negligible flame spread when used as a sealant in 1/8" joints on incombustible insulation; however, Liquid Carbonic spread the mastic over the entire surface of the Owens-Corning foam, which is not incombustible, as a vapor barrier. Richard Lindstrom did a flammability test on a sample of incumbustible insulation coated with Benjamin Foster mastic and found that the mastic caught fire immediately and ignited even the incombustible material. Based on his investigation, Mr. Lindstrom concluded that the Benjamin Foster mastic should be used only as a sealant and not as a vapor barrier. William Swaney of Owens-Corning also testified that the use of the mastic was improper, and stated that he had expressed this concern at the meeting during which the reinsulation of the box was discussed. Mr. Kotulski testified that he thought the mastic was inflammable, and Mr. Donnelly admitted that Liquid Carbonic had never tested it for flammability. In view of this evidence, we agree with the trial judge's conclusion that it was probably the Cook foam or the Benjamin Foster mastic which actually ignited and started the fire.
A final reason supporting the judgment for defendants herein is Liquid Carbonic's negligence in failing to follow even its own policies regarding basic safety precautions. For instance, the removal of the original foam insulation from the floor of the cold box, which procedure was necessary before repairing the floor, was obviously not done properly, as at least give witnesses testified that small pieces of insulation remained on the floor, the lower walls, and the underside of the floor beams. An expert, confirmed that due to increased surface area, a small piece of material will catch fire more rapidly than a larger one. In addition to this improper cleanup job, a Liquid Carbonic employee issued a hot work permit declaring that there were no combustible materials in the cold box, even though he admitted having observed pieces of insulation on the floor and the beams. Clifford Sherman, who issued the permit, testified that the only check he made before signing the permit for the welding was to lean inside the cold box with a "sniffer", a device used to detect explosive gases. Furthermore, although the maintenance supervisor for Petro Corporation testified that there would normally have been a fire watchman posted outside the cold box during welding, there was no such watchman; the only person present besides the welder was a helper who stayed inside the box. Finally, when the fire actually started, Liquid Carbonic personnel were impeded in their firefighting efforts by the absence of a nozzle from the fire hose; Mr. Sherman stated that if he had not had to go 100 yards to retrieve a new nozzle, he could have gotten to the fire ten to fifteen minutes sooner. In light of this evidence, we cannot say that the fire was caused solely by the presence of the Owens-Corning insulation in the box.
In conclusion, after considering all the evidence, we hold that the trial judge was correct in finding that Liquid Carbonic failed to prove its allegations against BASF Wyandotte and Owens-Corning, and therefore, affirm the dismissal of plaintiff's action.

Admissibility of Consent Decree:
Plaintiff in this issue contends that the trial judge should have admitted into evidence *1231 a Federal Trade Commission consent decree entitled, In the Matter of the Society of the Plastics Industry, Inc., 84 F.T.C. 1253 (1974), as prima facie evidence of misrepresentation of advertised products by BASF Wyandotte and Owens-Corning. After our review of the record, we find the trial judge correctly excluded this evidence.
Because consent decrees are merely settlements between the parties without any concession of wrongdoing, consent orders entered without a trial or testimony cannot be used as evidence or as admissions of statements contained therein. Commercial Communications, Inc. v. Public Utilities Commission, 50 Cal.2d 512, 327 P.2d 513 (1958), cert. denied 359 U.S. 341, 79 S.Ct. 896, 3 L.Ed.2d 927; New Jersey Wood Finishing Co. v. Minnesota Mining and Mfg. Co., 332 F.2d 346 (3 Cir. 1964) aff'd 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965).
In this particular instance, plaintiff sought to introduce a consent decree entered into between the Federal Trade Commission and several manufacturers of certain plastics, among whom are Owens-Corning Fiberglass and BASF Wyandotte. At no time was plaintiff a party to this decree. Clearly, plaintiff desires to admit this evidence as proof of some wrongdoing on the part of Owen-Corning and BASF Wyandotte's part. However, under the law, the scope of a consent decree must be limited to what is contained within the document itself; it should not be construed as implying wrongdoing on anyone's part. As the Supreme Court in United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), held:
Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.
Plaintiff, as a third party to the consent decree, attempts to use the consent decree to establish wrongdoing on the part of Owens-Corning and BASF Wyandotte, and thereby show that it is free from fault. A third party who is a stranger to the decree and not a party to the government action either directly or by intervention cannot attempt to enforce it against the defendant. Control Data Corp. v. I.B.M., 306 F.Supp. 839 (D.Minn.1969), aff'd Data Processing Fin. & Gen. Corp. v. International Bus. Mach. Corp., 430 F.2d 1277 (8 Cir.1970).
Since federal law is well settled that a consent decree entered into before any testimony was taken or evidence admitted is not admissible as evidence in another lawsuit, we will not, as plaintiff would like this Court to do, create new law to the contrary. Chambers & Barber, Inc. v. General Adjustment Bureau, 60 F.R.D. 455 (S.D.N.Y.1973).
After careful review of the record and the law, we find that the trial judge correctly excluded from the evidence the consent decree sought to be introduced by the plaintiff.

*1232 IMPOSITION OF COSTS:
Plaintiff also complains that the trial judge adversely imposed certain costs upon it. The only costs which can be taxed against a litigant are those specifically provided for by statute. Succession of Franz, 242 La. 875, 139 So.2d 216 (1962); LSA-R.S. 13:4533, LSA-R.S. 13:3661, LSA-R.S. 13:3666, LSA-R.S. 13:3671.
LSA-R.S. 13:4533 provides:
The costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs.
The trial judge awarded as costs to Owens-Corning the cost of certain depositions of witnesses and experts used at the trial, as enumerated in his Reasons for Judgment on Rule to Tax Costs in the amount of $2281.30. In addition, the trial judge awarded to BASF Wyandotte the cost of the depositions used at the trial of their witnesses and experts in the amount of $2414.89.
Upon a review of the evidence, we find that Owens-Corning obtained an original and one copy of most of the depositions used at the trial. However, on two of the depositions, Owens-Corning only received a copy of the depositions. Whereas, BASF Wyandotte received copies of all depositions except for one used at the trial. Plaintiff complains that BASF Wyandotte requested and received up to three and four copies of several depositions. Plaintiff urges that BASF Wyandotte is not entitled to the cost of copies of depositions. Any argument of this kind is unrealistic. If only the original deposition cost is allowed by statute, the fact that the original is filed in the record at the Court would put a hindrance on all counsel in preparing for trial in that each counsel would spend extra time and effort to review the deposition at the courthouse. Not one of the extra copies ordered by BASF Wyandotte was for a deposition not used at trial. In the area of complex litigation, such as this case, we conclude the extra copies were useful and cost efficient in preparing for trial.
As stated in Kommer v. Assenheimer, 174 So.2d 197 (La.App. 4th Cir.1965), the court held that a copy of a deposition obtained for private use of a litigant was not an allowable cost. This is totally opposite to the present situation. In Kommer, supra, the depositions were for the personal use of the plaintiff and were never used at the trial. In this case, all of the depositions which were taxed as costs were used at the trial. This case lies more in the realm of United States v. Kolesar, 313 F.2d 835 (5 Cir.1963). In Kolesar, supra, the court went to great lengths to discuss the benefits of the use of copies of depositions. This court is of the opinion that the holding in Kolesar is more in line with the taxing of deposition costs as contemplated by La.R.S. 13:4533. In an effort to provide a speedy and efficient conclusion to the discovery of facts in this case BASF Wyandotte ordered the extra copies.
Although the trial court's discretion in taxing costs does not extend to taxing an item not allowed by statute, common sense seems to justify a court allowing the cost of a deposition copy. The cost in this case of obtaining extra copies of certain depositions was not prohibitive. Although some of the copies were obtained for expert use, many of the copies were obtained for use by the litigant's co-counsel whose work was outside of this state. The trial judge found the cost of these depositions was allowable under the statute. Considering the nature and length of this particular case, we find the actual cost of ordering the extra copies was not so out of proportion to the total cost of litigation as to be an abuse of discretion on the part of the trial court to award such a cost. Therefore we will allow the costs of the depositions paid by Owens-Corning in the amount of $2281.30 and BASF Wyandotte in the amount of $2414.89.
Plaintiff next contends that the award of expert fees was excessive and should be reduced by this Court. The fixing of expert fees is in the discretion of the trial judge. Succession of Moody, 306 *1233 So.2d 869 (La.App. 1st Cir.1974). This amount will not be set aside on appeal in the absence of an abuse of discretion. D'Angelo v. New Orleans Public Service, Inc., 405 So.2d 1262 (La.App. 4th Cir.1981). Our review of the record shows that, although some of the fees were high, considering the prolonged length of time in litigation, there was no abuse of discretion in awarding the expert's fees.
With regard to the incidental photocopying expense, the trial judge found that this expense was justifiable in connection with the depositions used at the trial of this case. As these costs are allowed by statute, LSA-R.S. 13:4533, the trial judge correctly allowed this expense.
The final cost that Plaintiff is aggrieved is the cost incurred by BASF Wyandotte in order to comply with a discovery request of plaintiff. The request was for Production of Documents and was couched in general terms. Several attempts were made by BASF Wyandotte to limit the request but each request was denied by plaintiff. The trial court's order, following a Motion to Compel, specified that all reasonable costs in connection with the gathering for discovery of certain documents was to be paid by the non-winning party in the litigation. As the trial judge so aptly stated: "If you are going to go fishing, you have to pay for the boat."
From the testimony at the Rule to Tax Costs, it is discerned that a great amount of time was consumed in complying with such a broad and general discovery request, not to mention the travel expense incurred. Counsel and two paralegals were required to travel to Michigan and spend approximately two weeks gathering the necessary documents. Counsel for BASF Wyandotte even suggested counsel for plaintiff travel to Michigan to review the documents there in order to reduce the cost of bringing the documents to New Orleans. This suggestion was refused by plaintiff. Although not normally an item taxable as a cost, the trial judge in his discretion allowed the travel and time expense as part of the reasonable cost of gathering the multitude of documents, most if not all of which were not even used at the trial. As the trial judge ultimately found that plaintiff did not prove his case, he assessed the cost of compliance with this discovery order to plaintiff. We again find that there was no abuse of discretion on the part of the trial judge and will not disturb this award on appeal.
For the reasons assigned, the judgment of the trial court is Affirmed. All costs of this appeal to be paid by Plaintiff-Appellant.
AFFIRMED.
REDMANN, C.J., dissents in part.
REDMANN, Chief Justice, dissenting in part.
I subscribe to the opinion except, in part, as to costs.
This case awards almost $75,000 in costs. Its costs aspects by themselves are more complicated than the entire appeal in most of the cases that this court sees. But the costs questions are overshadowed by the complexities of the principal subject of this particular appeal.
I believe the statute does not allow as costs for depositions the expense of additional copies, notwithstanding that the party finds it convenient to have more than one available for its use and therefore buys two, three, or four copies from the court reporter. Nor would I allow the law firm charges and travel expenses, as at the time of out-of-town microfilming of thousands upon thousands of documents to comply with a broad discovery order that required copying rather than inspection (though I would allow the other expenses thereof), for those charges and travel expenses appear indistinguishable from fees and travel for depositions.
Recoverable costs do not include "all the expenses which [a litigant] is obliged to incur in obtaining judgment ..., [but only] *1234 such as are taxed according to law ...," La.C.C. 3196. Comment, "Taxing of Substantial Litigation Costs in Louisiana," by James W. Vaudry, 51 Tul.L.Rev. 657, 674-675 (1967), observes:
"The actual cost of taking depositions includes many items, e.g., attorney's fees, travel expenses, and the reporter's fee. The Louisiana Supreme Court, however, [in Succession of Franz, 242 La. 875, 139 So.2d 216 (1962)] has restricted the taxable cost to the reporter's fee by rejecting inclusion of the transportations costs of a deposing attorney and an out of state attorney's fee for arranging a deposition to be taken in his state.
"[Kommer v. Assenheimer, 174 So.2d 197 (La.App. 4 Cir.1965)] disallowed taxing of costs for a copy of a deposition obtained for the private use of a litigant, reasoning that it was not introduced into evidence or used at the trial. The result is correct, but it is hard to justify taxing the cost of a copy under any circumstances. Revised Statutes 13:4533 provides only for taxing the cost of taking the deposition, and, with a few noted exceptions, the supreme court has rejected taxing the costs of any item not clearly allowable by statute.
* * * * * *
"There is no statutory provision allowing taxing of the costs of private documents which are introduced in evidence at the trial. However, there are cases holding that the final phrase of [the statute]"and all other costs allowed by the court"grants the trial judge discretion to tax the cost of documentary evidence, such as maps and surveys, if essential to the cause. Desirable as such an interpretation may be, it has received no support in subsequent decisions. With the few noted exceptions, the courts have consistently held that only those items enumerated by statute can be taxed as costs."