591 So.2d 1228 (1991)
David G. MONTELEONE
v.
Erin Ann Collins MONTELEONE.
No. 89-CA-2216.
Court of Appeal of Louisiana, Fourth Circuit.
December 11, 1991.
*1230 Harry R. Cabral, Jr., Cabral & Cabral, Metairie, for plaintiff-appellant.
Terence L. Hauver, Lowe, Stein, Hoffman, Allweiss & Hauver, New Orleans, for defendant-appellee.
Before BARRY, WILLIAMS and PLOTKIN, JJ.
PLOTKIN, Judge.
Appellant, David Monteleone, contends the trial court erred in denying his rule to change custody. We disagree and, therefore, affirm the judgment of the trial court.

FACTUAL AND PROCEDURAL HISTORY
Erin and David Monteleone married on June 27, 1975. Their marriage produced one child, Christina, who was born on November 23, 1979. The Monteleones physically separated in May, 1986.
David filed for divorce on September 30, 1987. His petition requested that the parties be awarded joint custody with Erin "being designated as primary, physical custodial parent, subject to liberal and reasonable visitation by David" and asserted that he voluntarily agreed to pay the sum of $800 a month child support plus the child's school tuition and registration fees. Following a hearing, the Monteleones were divorced on December 23, 1987, based on their living separate and apart, without reconciliation, for a period in excess of one year. The judgment ordered David to pay child support in the sum of $800 a month and the child's tuition and registration fees. Joint custody was awarded to both parties, with Erin designated as primary, physical custodial parent.
By consent judgment of April 4, 1988, Erin accepted $1500 in return for her waiver of any rights she may have had to a nullity action arising from the judgment of December 23, 1987. The April 4th consent judgment ratified and confirmed the terms and conditions of the December 23, 1987 judgment.
On July 2, 1988, three months after the consent judgment was signed, David remarried. Five months after the consent judgment was signed, David filed a rule to change custody on August 31, 1988. The rule requested that David be awarded sole custody of Christina and be declared her physical domiciliary parent for the following reasons:
1. Erin "is emotionally and mentally unstable and is possibly dangerous to both herself and to the welfare of the minor child;"
2. Erin "is guilty of habitual intemperance on a daily basis and is in dire need of treatment for said disorder, all of which justifies an award of custody to mover herein;"
3. Erin "has been derelict and irresponsible in the care and rearing of the minor child, in properly feeding the child, in properly clothing the child for school, and has generally neglected all the normal duties that a fit parent should be held accountable for in rearing a minor child;"
4. Erin "is further guilty of failing to provide the social interaction required between a mother and its child to stimulate normal behavioral patterns conducive to the proper development of a healthy and normal child;" and
5. Erin "has been negligent in the educational support required on behalf of the minor child and as a result the minor child has been forced to repeat the first grade at MeGehee School, all of which is contrary to the best interest of the minor child."
The rule further asserted that David had remarried and his wife was capable of and willing to rear Christina on a fulltime basis and that a psychological evaluation of Christina had been conducted at Ochsner which showed her welfare and well being was deteriorating as a result of being in the care, custody and control of her mother. In the alternative, the rule requested that if he was denied sole custody, that child support payments be reduced from $800 to $250 a month because he and his wife were expecting a child and Erin had become gainfully employed.
*1231 Trial on the merits of the rule was held on March 14, 17 and 23, 1989. Elaborating on the allegations he raised in his rule for custody, David testified his allegation that Erin is mentally unstable is solely based upon her intemperance and is founded upon her drinking habits as he knew them prior to the divorce and initial custody judgment.[1] He testified his allegation that Erin is emotionally unstable is based on her inability to keep her house clean. He also admitted that, during their marriage, she never cleaned the house. He admitted he has not seen the inside of her home since July of 1987. David testified his allegation that Erin is dangerous to herself and to her child is based upon Erin's sleeping habits. He said she "wouldn't wake up to a fire in the middle of the night," but he admitted the allegation is founded upon her sleeping habits as he knew them during their marriage.
David testified his allegation that Erin is derelict in feeding Christina is not a current problem. He said his allegation that Erin fails to provide Christina with proper social interaction is partially based on Erin's choice of summer camp and partially on her not allowing Christina to have overnight guests. He admitted, though, that even during their marriage Erin never allowed overnight guests. He testified his allegation that Erin is negligent in the educational support of Christina is based on Erin's failure to help Christina with her homework and to read to her at night. He also admitted those problems existed during their marriage and prior to the initial custody judgment. Regarding his accusation that Erin did not keep Christina or her clothes clean, David admitted that his daughter's teachers at McGehee had never raised such a complaint and that he never told Erin that Christina's shoe was missing at Thanksgiving of 1988. He also admitted the Ochsner reports and psychological evaluations do not support his allegation that the welfare and well-being of Christina is deteriorating as long as she is in the care, custody and control of her mother.
David and his mother, Ruth Monteleone, testified that during the summer of 1988, she saw Christina playing on Canal Boulevard with two friends, several blocks away from Erin's home. They both testified they thought Christina should not play on the boulevard or in City Park. He admitted, though, that he never told Erin about the incident. David testified that during his marriage to Erin, his mother warned them both about Christina having a hereditary hearing problem, but neither of them acted upon her advice. After the divorce, Erin arranged for Christina's ear operation.
David admitted that during the 1985-86 school year, Christina did very well academically at McGehee school. He and Erin separated in May of 1986. At the end of the following school year, 1986-87, Christina was retained in the first grade due to her immaturity. Based upon her retention in the first grade, on his mother's recommendation, David said he and his mother had Christina evaluated at Ochsner. He admitted he did not initially tell Erin about the evaluations, but said she learned about them prior to their completion in September of 1987.
The Ochsner recommendation was for Christina to attend Crescent Academy and have counseling. He testified he and Erin jointly decided to keep Christina in McGehee because she had already begun a new school year. David said he and his fiancee arranged, in January of 1988, for Christina's psychotherapy counseling under Mrs. Stavros. He said he did not immediately inform Erin about the counseling sessions. He further admitted he informed Mrs. Stavros that Erin was not interested in taking part in the sessions, was inconsistent and was disorganized, and that she drank every evening and yelled at Christina. He said Christina's grades for her repeated year of first grade, 1987-88, were all A's except in mathematics. David testified he took Christina to St. George's *1232 Episcopal School, where she attends the second grade, without first informing Erin. He testified Christina was the poorest reader in her second grade class, but she was progressing. He also admitted his maid told him Christina had been wetting the bed with increased frequency and her bed-wetting correlated in time with when he informed her about the rule for change of custody.
The court's appointed psychologist, Dr. Brian Keith Jordan, testified about his individual psychological evaluations of the mother, father, stepmother and child. He also testified he reviewed Ochsner's 1987 psychological evaluation of Christina's educational system and the note summaries of Christina's treating social worker, Mrs. Stavros. He admitted David arranged for him to have the Ochsner reports and the notes of the social worker prior to his evaluation of Erin. He also said he was aware that Erin was the primary parent in the Monteleone's joint custody arrangement, but admitted he nevertheless contacted David about arranging his additional sessions with Christina.
Dr. Jordan testified that he was concerned about Erin's denial of the existence of Christina's diagnosed problems. He based this concern upon multiple comments he found in the Ochsner report, "specifically her reaction to Dr. [Aden Burka], as he quoted in 1987 that Mrs. Monteleone was `taken aback' at his findings," and upon the comments of the social worker, Mrs. Stavros. Dr. Jordan said he also discussed with Erin Christina's ongoing learning disability, but she showed no indication of understanding it. Consequently, he felt her parenting skills were limited.
While testifying, Dr. Jordan diagnosed Christina as having dyslexia, a neurologically based disorder. Dr. Jordan admitted, though, that Ochsner had not diagnosed Christina as dyslexic and Erin had no prior knowledge about this on-the-stand diagnosis. Commenting on Erin's failure to affirmatively act upon the Ochsner recommendation, Dr. Jordan testified "that a parent who cares transcends their hostility, or suspiciousness of the party who brought the child in." He said the parent either respects the doctor's findings and makes further inquiries about the diagnosis or, if the diagnosis is not accepted, obtains a second opinion.
Dr. Jordan testified that he was also concerned about the poor relationship that existed between Christina and her mother, but he admitted that Christina loves her mother very much. He indicated he found inadequate the amount of time that Erin spent helping Christina with her homework.
The deposition of Christina's social worker, Helen Stavros, was entered into evidence. Mrs. Stavros testified that her evaluations of Christina began on January 5, 1988, prior to the remarriage of David. Her initial impression was that Christina was very immature. She said that in January of 1988 David had expressed to her his concern about Erin's deficiencies in child-rearing and its detrimental effect on Christina. In response, she had suggested that he seek physical custody of Christina. She said David demurred, stating he could not handle the child as a single parent.
Mrs. Stavros found the child was very upset about her parents' divorce and was confused about where she wanted to live. She testified Christina initially told her she fought with her mother on a daily basis, but by January of 1989 the daily arguments had ceased. As Christina grew closer to her stepmother, Mrs. Stavros indicated the child had become confused about the dilemma of having two mothers. She found the child had adapted well to the family environment in David's home and had expressed the desire to reside with her father, but she also found Christina needed her relationship with Erin. She indicated that, due to the stress Christina was under as a result of the father's custody rule, the child complained of headaches, stomachaches and wetting on herself during the day. Her notes indicated that when the custody rule was discussed at a family session with David and his wife, Christina became very quiet, looked tearful and said, "How would you feel if you were getting ripped away from someone you loved?"
*1233 Mrs. Stavros indicated her impression of Erin was that Erin minimized and discounted Christina's problems. In conclusion, Mrs. Stavros informally recommended Christina live with her father during the week and with her mother on weekends. She based her recommendation upon the father's household providing greater stimulus, structure and discipline than the mother's household provided.
Erin's treating psychologist, Dr. Jerry Stephen York, testified he first examined Erin on October 4, 1988, and has had three or four sessions a month with her since that time. When he first examined her, he found she had dysthymnia, a mild chronic depression. He also found her self-image shaky. He related her depression and anxiety to the change of custody rule. He said she felt a great deal of anger and a lot of surprise about this suit.
Dr. York found she did not have an addictive personality (she tested moderate), but felt she should be evaluated specifically by someone that specializes in treating alcoholism or she should enter an alcohol abuse treatment program. She had informed him that she stopped drinking alcohol. He said he knew she had contacted a drug abuse program, but it was cancelled due to insufficient enrollment.
Dr. York said her attitude towards the Ochsner team which evaluated Christina was guarded, but she felt Mrs. Stavros' counseling had probably helped her daughter. He felt her initial defensiveness towards these people was due to David arranging the evaluations without her knowledge. When she was informed of their existence, she felt left out and suspicious.
Dr. York admitted that his examination of Erin revealed she has a tendency to ignore problems and hope they will disappear. He also felt she has a tendency to block out unwanted information. However, he did not feel she had blocked out the findings of Ochsner and of Mrs. Stavros, but rather had not understood and/or agreed with all of their findings. Particularly, as she had been told her daughter had a learning problem, she did not understand why Christina was in psychotherapy.
Mrs. Jeffery H. Collins, Erin's mother, testified that she sees Christina daily, except for weekends. Mrs. Collins said she takes Christina to school and keeps her for about an hour and a half after school. She attested that in the morning Christina's school uniforms and hair are clean. After school, she gives Christina a snack and, if Erin works late, feeds her dinner. Mrs. Collins said she was aware that Christina occasionally urinated on herself and in her bed.
Regarding David's allegation of her habitual intemperance, Erin testified that in December of 1987, when they entered their original consent judgment, she was drinking about a bottle of wine a night. She said she discussed her drinking habits with Dr. York and he had suggested she stop drinking and enroll in an adult education class on alcohol abuse. She attested that she stopped drinking a few months prior to trial. She said she enrolled in an alcohol abuse treatment program, but it was cancelled. She said she has not enrolled in another program because she voluntarily stopped drinking and it has not been a struggle to keep from drinking.
Erin admitted the original Ochsner evaluation indicated that Christina was operating approximately two years below her age level and was extremely weak in mathematics. She admitted that she had not procured for her daughter any of the books on her summer reading list. She also admitted that she did not review math problems with Christina during the past summer. She testified, however, that since Christina entered the second grade, she spends more time with her reviewing her homework, especially with her weakest subject, math. Erin testified she and her daughter are getting along much better than they had previously. She attributed the change in their relationship to her exercising greater patience, listening better and being less judgmental.
Erin admitted she was not actively involved with her daughter's evaluations and psychotherapy at Ochsner. She said she had not contacted David since their divorce. She admitted she refused to talk to him on *1234 the two occasions he contacted her. She said that, on those two occasions, she informed him of when it would be more convenient for them to talk.
Following the conclusion of the hearing, the court rendered judgment on July 6, 1989. The judgment denied the rule to change custody, ordered Erin to continue her treatment with Dr. York and ordered David, his wife, Erin and Christina to participate in family and/or step-family counseling. Citing Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), the court found David failed to prove that a change of circumstances, materially affecting Christina's well-being, had occurred since the signing of the consent judgment. The court found David's remarriage and the child's supposed paternal preference to be immaterial. The court also noted "with some interest that much of the evidence and testimony concerned events that occurred prior to the signing of the consent judgment," and that "David was fully aware of Erin's problems when he entered the consent judgment." Thus, the court found there were "absolutely no material changes since the parties entered the consent judgment."
The court's written reasons also urged the parties to structure a visitation schedule[2] where Christina would spend more structured time with her father and more fun time with her mother and to choose their family therapist together, instead of deferring the choice to David. From this judgment, David appeals.

LEGAL PRECEPTS
LSA-C.C. art. 131, formerly art. 146, establishes that the best interest of the child is the primary criterion for awarding or modifying custody. Bergeron v. Bergeron, supra.; Bordelon v. Bordelon, 390 So.2d 1325 (La.1980). Regarding rules to change custody, however, more is at stake than simply selecting the best of proposed custodianships. See Bergeron v. Bergeron, supra. Harm may result from disrupting the child's established mode of living and injury may result from encouraging unjustified litigation or the continuation of parental conflict. Id. Consequently, in order to protect children from the detrimental effects of too liberal standards in custody change cases, our Supreme Court requires the party seeking the change to clearly show the child nets a benefit by the change. Id. This policy is implemented through the following burden of proof rule:
When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody rule is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. 492 So.2d at 1200.
In the Fourth Circuit, a consent judgment resolving child custody is a considered decree. Smith v. Smith, 559 So.2d 48 (La.App. 4th Cir.1990); Schultz v. Schultz, 553 So.2d 1010 (La.App. 4th Cir. 1989); Nelson v. Nelson, 544 So.2d 1320 (La.App. 4th Cir.1989); Lauga v. Lauga, 537 So.2d 758 (La.App. 4th Cir.1989); Allen v. Allen, 533 So.2d 1068 (La.App. 4th Cir. 1988), rev'd on other grounds, 536 So.2d 1227 (La.1989). Cf. Preau v. Preau, 499 So.2d 1270 (La.App. 4th Cir.1986); Lecount v. Lecount, 496 So.2d 1087 (La.App. 4th Cir.1986).[3] Public policy dictates that *1235 where parties voluntarily chose not to litigate, reached an agreement on child custody by mutual consent, and then sought and received the court's approval on their agreement, the resultant judgment is valid and enforceable. See Allen v. Allen, supra. This Circuit declines to diminish the impact of such a consent judgment by finding it less than a considered decree. See Id.
The standard for reviewing decisions concerning the modification of custody agreements is to afford great weight to the determination of the trial court and not to disturb its discretion absent a clear showing of abuse. Bergeron v. Bergeron, supra.; Smith v. Smith, supra. Thus, in addition to the paramount best interest of the child standard, this Circuit applies the heavy burden of proof rule, the change of circumstances rule, and the appellate standard of review rule to change of custody matters which follow consent judgments. Parker v. Parker, 559 So.2d 37 (La.App. 4th Cir.1990).
Additionally, a child's preference to live with a different parent is not, of itself, a material change of circumstances affecting the child's welfare. Bergeron v. Bergeron, supra.; Smith v. Smith, supra. But see LSA-C.C. art. 146(C)(2)(i). Nor is the remarriage of the noncustodial parent and the superiority of the stability of that parent's new, daily environment, by itself, a compelling reason to uproot a child from his or her present environment. Bailey v. Bailey, 527 So.2d 1030 (La.App. 2d Cir. 1988), writ den., 528 So.2d 565 (La.1988); Tolar v. Tolar, 569 So.2d 267 (La.App. 2d Cir.1990). Stability and continuity of environment continue, at all times, to be important considerations in custody determinations. Hillidge v. McFarland, 566 So.2d 192 (La.App. 2d Cir.1990). Cf. Myers v. Myers, 561 So.2d 875 (La.App. 2d Cir.1990).

APPLICATION OF LEGAL PRECEPTS TO THE FACTS
David Monteleone contends that the trial court erred 1) as a matter of law by applying the Bergeron standard of review to his change of custody rule rather than applying the less stringent best interest of the child standard and 2) as a matter of fact by failing to find major changes of circumstances had occurred since the consent judgment was signed. We disagree.
First, the trial court applied the proper standard, Bergeron, to David's change of custody case. Smith v. Smith, supra.; Allen v. Allen, supra. Prior to the initial judgment, David had a full and fair opportunity to litigate the custodianship of Christina. Nevertheless, he voluntarily chose the present custody arrangement, even praying for it in his petition for divorce.
The aim of Bergeron is to protect people like Erin and Christina from the monetary and emotional expense of multiple lawsuits. Consequently, the standard set forth in Bergeron is designed to conserve judicial resources, foster reliance upon court judgments, and discourage the continual harm which may result to children like Christina as a result of custody litigation, custody changes and interparental conflict. See Bergeron v. Bergeron, supra.; Palazzo v. Coe, 562 So.2d 1137 (La.App. 4th Cir.1990), writ den., 567 So.2d 611 (La.1990). Thus, if trial courts like the one below failed to apply the standard espoused in Bergeron, merely because the prior custody determination was a consent judgment, the potency of Bergeron's doctrine would be abrogated.
Second, affording great weight to the trial court's determination, we find its ruling was not an abuse of discretion. The trial court found that David failed to prove that a change of circumstances, materially affecting Christina's well-being, occurred after the signing of the consent judgment. As a young child's preference to live with the noncustodial parent and the remarriage of the noncustodial parent are not, by themselves, compelling reasons to uproot a child from her present environment, the evidence adduced at trial supports the court's conclusion.
The trial court correctly concluded that much of the evidence concerned events which preexisted the initial custody decree. *1236 We found the majority of David's trial evidence pertained to the habits and traits Erin exhibited during the Monteleones' marriage. David even frankly admitted his claims of Erin's alleged emotional and mental instability, habitual intemperance and parental neglect, were founded upon the drinking habits, poor housekeeping habits, sleeping habits, and non-reading and non-homework habits which she possessed during their marriage.
The trial court also correctly concluded that David was aware of Erin's personal and parenting deficiencies and the effect it had on Christina, prior to the signing of the consent judgment on April 4, 1988. David's testimony indicated that during the school year encompassing his physical separation from Erin, 1986-87, Christina had problems in school. In the Spring of 1987, McGehee School retained Christina in the first grade based upon her immaturity. On his mother's prompting, he took Christina to Ochsner where her educational levels were tested. He testified he knew the results of the Ochsner's psychological evaluations by September of 1987, several months prior to his divorce and the custody determination. Additionally, both Mrs. Stavros and David's testimony indicated he was aware of the alleged deficiencies in Erin's parenting skills prior to the ratification of the initial custody determination.
Further, it was not error for the trial court to decline to adopt the custody recommendation of the court appointed psychologist. As David had the reports of Ochsner and Mrs. Stavros delivered to Dr. Jordan and as he read them prior to meeting Erin, the trial court may have concluded that Dr. Jordan was unable to make an initial impartial and independent review of the situation and this lack of impartiality would have greatly diminished the value of his opinion.
Accordingly, the judgment of the trial court is affirmed. All costs are charged to appellant.
AFFIRMED.
BARRY, J., dissents with written reasons.
BARRY, Judge, dissents with written reasons.
The majority has ignored this Circuit's Howes v. Howes, 388 So.2d 1182, 1184 (La. App. 4th Cir.1980), writ refused 393 So.2d 738 (La.1980). The conflict should be resolved en banc. More importantly, the First, Second, and Third Circuits have also held that a consent judgment is not a considered decree.
I disagree with the majority's statement that in the Fourth Circuit a consent judgment resolving child custody is a considered decree. The majority's reliance on Allen v. Allen, 533 So.2d 1068 (La.App. 4th Cir.1988), rev'd 536 So.2d 1227 (La.1989) is misplaced. Nor did Allen consider Howes.
The Supreme Court in reversing Allen stated: "Granted. Judgment of the court of appeal is reversed. Judgment of trial court is merely a change in visitation rights, not a change in custody. Judgment of the trial court is reinstated."
The majority also cites Schultz v. Schultz, 553 So.2d 1010 (La.App. 4th Cir. 1989) which totally relied on Allen. Smith v. Smith, 559 So.2d 48 (La.App. 4th Cir. 1990), Nelson v. Nelson, 544 So.2d 1320 (La.App. 4th Cir.1989), and Lauga v. Lauga, 537 So.2d 758 (La.App. 4th Cir.1989), also cited by the majority, do not discuss the burden of proof in light of a prior consent judgment. It is not clear that in those cases the previous consent judgment was the basis for the ruling.
A judgment obtained by consent of the parties gets its binding force from the presumed voluntary acquiescence of the parties, not from adjudication by the court. Succession of Simmons, 527 So.2d 323 (La. App. 4th Cir.1988), stay and writ denied 529 So.2d 12 (La.1988); Chaisson v. Chaisson, 454 So.2d 890 (La.App. 4th Cir.1984); Godfrey v. Project Square 376, 477 So.2d 920 (La.App. 4th Cir.1985), writ denied 478 So.2d 905 (La.1985). See also City of New Orleans v. VanLangendonck, 433 So.2d 432 (La.App. 4th Cir.1983); Liquid Carbonic Corporation v. VASF Wyandotte *1237 Corporation, 468 So.2d 1225, 1231 (La. App. 4th Cir.1985). A consent judgment is a bilateral contract wherein parties adjust their differences by mutual consent and put an end to litigation with each party balancing the hope of gain against the fear of loss. Ritchey v. Azar, 383 So.2d 360 (La.1980); Succession of Koch, 487 So.2d 635 (La.App. 4th Cir.1986), writ denied 489 So.2d 251 (La.1986).
In Howes v. Howes, 388 So.2d 1182, 1184 (La.App. 4th Cir.1980), writ refused 393 So.2d 738 (La.1980), this Court considered a consent judgment which continued custody of children with the mother. This Court found a consent decree was not a considered decree, and used the lesser burden of the "welfare of the children" in its determination, not the heavy burden triggered by a considered decree under the jurisprudence at that time. This Court stated:
`Considered' is defined as `deemed, determined, adjudged, reasonably regarded'. Black's Law Dictionary 278 (5th Ed. 1979). The First Circuit has held that a considered decree of custody is one which is rendered after a trial of the issue and decision thereon applying pertinent principles of law. Gulino v. Gulino, 303 So.2d 299 (La.App., 1st Cir., 1974); Penton v. Penton, 260 So.2d 5 (La.App., 1st Cir., 1972). Both Gulino and Penton involved consent judgments and were cited with approval in Lemons v. Lemons, 325 So.2d 734 (La.App., 1st Cir., 1976). A consent judgment is not a judicial determination of any litigated right. See 49 C.J.S. Consent § 173. Further, it has been held that a custody judgment by default without evidence of fitness is not a considered decree. Stevens v. Stevens, 340 So.2d 584 (La.App., 1st Cir., 1976).
We conclude the consent judgment on March 9, 1979 is not a `considered judgment'....
See also Spencer v. Talabock, 370 So.2d 684 (La.App. 4th Cir.1979).[2]
Other circuits have held that a consent judgment is not a considered decree to trigger the heavier burden of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986) or the third guideline of its predecessor, Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971). Lee v. Lee, 545 So.2d 1271 (La.App. 2d Cir. 1989); Lynn v. Lynn, 316 So.2d 445 at fn. 2 (La.App. 3rd Cir.1975), writ denied, 320 So.2d 209 (La.1975); Gulino v. Gulino, 303 So.2d at 303.
In Hillidge v. McFarland, 566 So.2d 192, 194 (La.App. 2d Cir.1990) the Second Circuit defined a considered decree:
A considered decree is one rendered subsequent to the presentation of evidence as to the fitness of a party to have the care, custody and control of the children. Conversely, where no such evidence has been presented, the custody judgment is not a considered decree. Dungan v. Dungan, 499 So.2d 149 (La.App. 2d Cir. 1986); Stevens v. Stevens, 340 So.2d 584 (La.App. 1st Cir.1976).
Based on this circuit's Howes which is in tune with the other circuits' jurisprudence, the consent judgment at issue here is not a "considered decree" as to the custody of the minor child. The "change of circumstances" standard of Bergeron should not apply.
The trial court applied the wrong standard to deny the custody change.
However, the record is complete and subject to review. The father has shown that it is in the best interests of Christina to have her placed in his sole custody subject to structured visitation by the mother.
I respectfully dissent.
NOTES
[1] David admitted that when they married in 1975, she was drinking a six-pack of beer a day and when they separated in May of 1986, she was drinking a bottle of wine a night and a bottle of gin or vodka a week. However, he never attempted to get her treatment. He admitted he has no personal knowledge of Erin's drinking habits since their separation.
[2] The trial court stated it found no structured visitation schedule in the record and Erin testified that, although there was no formal agreement, visitation had evolved to David taking Christina every weekend.
[3] Allen and Schultz both involve rules to change custody from prior consent judgments and, before applying Bergeron's burden of proof rule, affirmatively state that a consent judgment is a considered decree. Smith, Nelson and Lauga also involve rules to change custody from prior consent judgments. These cases, however, apply Bergeron's burden of proof rule without preamble and treat the consent judgment/considered decree factor as a non-issue. Likewise, in dicta, Preau indicated Bergeron's burden of proof rule was applicable to a rule for joint custody attempting to modify a prior consent judgment of sole custody, and Lecount indicated Bergeron's heavy burden of proof rule was applicable to its rule to change custody even though the prior custody decree had been uncontested.
[2] In Spencer there had been a number of consent judgments as to custody prior to the father's filing a rule which was at issue in the appeal. This Court stated that "the judgment under review is the first considered determination of custody...." 370 So.2d at 685.