ON REHEARING
FREDERICKA HOMBERG WICKER, Judge.
pin this child custody case, this Court must decide whether the trial court erred in modifying a consent judgment that the parties stipulated would be governed by the heightened Bergeron standard.[1] For the reasons that follow, the judgment of the trial court is reversed in part and affirmed in part.
Facts and Procedural Background
The plaintiff/appellee, Ms. Jennifer Weems,[2] and the defendant/appellant, Mr. Jonathan Wyatt, are the parents of a six-year old girl, J.W., who was born in December of 2004. Jennifer and Jonathan’s relationship began to deteriorate shortly after J.W. was born; and though they never married, the parties separated. The litigation in this case arose on August 22, 2005, when Jennifer filed a “Petition for Protection from Abuse,” alleging that Jonathan had physically abused her. A temporary restraining order was imposed against Jonathan, and the parties began proceedings to determine the custody of their daughter.
|sOn May 15, 2006, the parties executed an Interim Consent Judgment whereby Jonathan received supervised visits with J.W. two days per week. Then, on February 26, 2007, the parties executed a Consent Judgment which increased Jonathan’s visitation with J.W. on a gradual basis. Jennifer and Jonathan then filed their final Consent Judgment on March 14, 2008 wherein they agreed to share physical custody of J.W. on a week-to-week basis. The March 14th agreement provided a comprehensive custody schedule and contained a stipulation which provided, “[t]he parties hereto stipulate that the terms and conditions as contained within this ‘Consent Judgment’ shall have the legal effect of a ‘considered decree,’ pursuant to the landmark Supreme Court case of Bergeron v. Bergeron.” (emphasis in original).
In late December 2008, Jennifer dropped J.W. off with Jonathan and his mother, Ms. Martha Wyatt, to allow Jonathan to exercise his custodial period. Jennifer informed Ms. Wyatt that J.W. had a bout of diarrhea. While changing her diaper, however, Ms. Wyatt observed that the diarrhea seemed more like a discharge. Because J.W. had suffered from recurrent yeast infections in the past, Ms. Wyatt telephoned Jennifer on Tuesday, December 30, 2008, and informed her that she thought J.W. might be suffering from a yeast infection. Jennifer called J.W.’s pediatrician, Dr. Patricia Granier, who instructed Jennifer to treat J.W. with Lotri-man AF — an antifungal cream — until she could see her in the office on Friday, January 2, 2009. Jennifer relayed the message to Ms. Wyatt, who treated J.W. with the ointment.
Jennifer met Jonathan, Ms. Wyatt, and J.W. at Dr. Granier’s office on Friday. Dr. Granier’s report indicated that she noticed the vaginal discharge and that she mentioned the possibility of sexual abuse to J.W.’s parents. Jennifer then questioned J.W. and asked if anyone had touched her. Dr. Granier observed that 14J.W. initially shrugged her shoulders re *112 peatedly and said “I don’t know,” but later recanted and said, “mawmaw hurts her [me].”[3] Jonathan then asked J.W. whether she was referring to when mawmaw put ointment or cream on her rash. J.W. answered “yes, but she hurts me and puts her fingers way up in my potsy.”[4]
During the examination, Dr. Granier took a vaginal culture for laboratory testing. The specimen tested positive for gonorrhea on January 5, 2009. Dr. Granier informed Jennifer of the results; however, Jonathan was not notified. Jennifer and her immediate family members were tested for gonorrhea — all tests were negative.[5]
Dr. Granier referred J.W. to the Audrey Hepburn CARE Center (the CARE center) on January 5, 2009, where Dr. Adrienne Atzemis noted “[njeisseria gonorrhea from vagina and urine culture done 01/02/09. This is definitive for intimate contact with infected secretion and for [sic] J.W. is definitive for sexual abuse.” Dr. Atzemis stated, however, that J.W. had not “disclosed contact sufficient to transmit gonorrhea.” Moreover, the doctor was unable to find any evidence of physical damage or trauma, as J.W.’s hymen was still intact. The CARE center reported its findings to the Louisiana Office of Community Sendee (OCS) and law enforcement.[6] OCS immediately commenced an investigation, and Jennifer suspended Jonathan’s custodial periods, contending that OCS instructed her to do so.[7]
Jonathan did not learn J.W. had gonorrhea until Wednesday, January 7, 2009, when an OCS employee visited his home during the course of their investigation. OCS requested that Jonathan and his family members be tested for 1 ¿gonorrhea. Jonathan immediately sought testing at the Jefferson Parish Health Unit but was told the results would not be available for ten days. He then went to an urgent care clinic on January 9, 2009 where he was tested. Jonathan’s results were negative.[8] Jennifer testified that OCS called her on January 14, 2009, informed her of Jonathan’s results, and advised her to reinstate Jonathan’s visitation.
On April 6, 2009, three months after reinstating Jonathan’s visitation, Jennifer filed a “Rule to Modify Custody & Ex Parte Motion for Temporary Custody,” alleging that J.W. disclosed to her on March 6, 2009, that Jonathan stuck his fingers up her “potsy.” Due to the seriousness of the allegation, the commissioner issued an order which suspended Jonathan’s custodial periods and granted Jennifer interim temporary sole custody pending the outcome of the custody hearing. The commissioner issued an Interim Judgment, on May 5, 2009, which effectively stayed the April 6th order. The matter was heard before the district court on August 19-20, 2010.[9]
*113 During the trial, Jennifer testified that on March 6, 2009, J.W. told her that “daddy stuck his fingers up my potsy.” She further stated that J.W. told her the incident occurred when she was three years old, even though J.W. was four when she made the disclosure. Upon learning this information, Jennifer drove to her mother’s house and called Ms. Hope Bell[10] and her attorney. Jennifer further testified that when her mother, Ms. Maria Rodriguez, asked J.W. what happened, | fiJW. responded, “[d]addy stuck his fingers up my potsy.” Ms. Bell instructed Jennifer to report J.W.’s disclosure to law enforcement.
Jonathan testified that he never touched his daughter inappropriately and that J.W. has never even seen him undressed. He further stated that the only times he touched J.W. in the genital area was after baths or when changing her diaper in order to apply ointment when needed.
Dr. Russell Steele, an expert in pediatric infectious disease, also testified. Dr. Steele did not examine J.W., but he reviewed all the medical records, reports, and other evidence in the record. He opined that children J.W.’s age contract gonorrhea from “sexual contact almost always with an adult or adolescent,” stating that it was impossible to contract the disease from the playground or from kissing. Dr. Steele further opined that, in J.W.’s case, the sexual contact would have occurred by the male genitalia being close to or introduced into J.W.’s vagina. He further explained that the sexual contact likely occurred five to seven days before the infection so that any physical damage would have healed by the time of J.W.’s examination.
Ms. Courtney Reardon, who was hired to supervise J.W.’s visits with Jonathan, also testified at the hearing. Ms. Reardon testified that during the exchanges, J.W. appeared tense — but only when both sets of families were present. She observed, however, that once Jennifer and/or her family members left, J.W. relaxed and had a normal, warm, and supportive relationship with her father. Ms. Reardon testified that J.W. was usually relaxed throughout the duration of the visit but became tense again when Jennifer and/or her family arrived. She testified that it appeared that J.W. did not want Jennifer to see her being affectionate with Jonathan.
17At the conclusion of the hearing, the trial court declined to reinstate the 50/50 custody arrangement. Instead, the court adopted the recommendation of the court appointed psychologist, Dr. Alan Klein, for a gradual reinstatement of Jonathan’s visitation rights and awarded the parties joint custody, designating Jennifer as the domiciliary parent. The court gave extensive oral reasons for its judgment; but most significantly, it was unable to determine that Jonathan sexually abused J.W. The court found that both parties were competent to raise J.W. and that neither party presented a threat to her welfare. The court additionally stated that Jonathan would be subjected to random drug testing, at Jennifer’s request, for a 12-month period. The parties were further ordered to meet after six months to discuss the status of the custody arrangement. The judgment was reduced to writing on August 20, 2010. Jonathan appeals.

Standard of Review

It is well-settled that a court of appeal may not set aside a trial court’s or *114 a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Evans v. Lungrin, 97-0541, 97-0577, (La.2/6/98), 708 So.2d 731, 735 (citation omitted). However, where one or more trial court legal errors interdict the fact-finding process, “the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence.” Id. (citation omitted).
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Id. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Id. When such a prejudicial error of law skews the trial court’s finding of a material issue of fact, the ^appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Id.
Before the trial commenced in this case, all parties conceded that the purpose of trial was for a judicial determination of J.W.’s custody and visitation. In child custody cases, the proponent of change bears the burden of proving a material change of circumstances. We note, however, that the trial judge applied an improper standard in this case. At the outset of the trial, the judge stated that based on his experience — both personal and professional — he would not allow a minor child, whose parents lived in different parishes, to be subjected to a 50-50 custody arrangement. The trial judge repeated this sentiment throughout the trial and in his oral reasons for judgment. There is no blanket rule, however, which prohibits the implementation of a such a custody agreement. Each child custody case must be considered in light of its own particular set of facts and circumstances Ledet v. Ledet, 04-509 (La.App. 5 Cir. 3/29/05), 900 So.2d 986. Because the trial judge committed a prejudicial error of law, we are required to “render judgment on the record by applying the correct law and determining the essential facts de novo.” Evans, supra, at 735.
Discussion
In his sole assignment of error, Jonathan argues that the trial court erred by modifying the existing decree after finding no factual basis to support Jennifer’s “Rule to Modify Custody and Ex Parte Motion for Temporary Custody.” Before addressing the merits of this appeal, we must determine whether the underlying March 14, 2008 pleading, captioned “Consent Judgment,” is a considered decree or consent decree. This determination is essential to the ^outcome of the case because the burden of proof required to modify the custody agreement depends on this classification.
“A ‘considered decree’ is an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children.” Silbernagel v. Silbernagel, 06-879, p. 6 (La.App. 5 Cir. 4/11/07), 958 So.2d 13, 17. Once a considered decree has been rendered, the proponent of the change bears the heavy burden of proving that a change of circumstances has occurred, such that the continuation of the present custody arrangement is so deleterious to the child as to justify a modification of the custody decree, or that harm likely caused by a change of environment is substantially outweighed by its advantages to the child. Id. citing Bergeron, supra, at 1200.
A “consent decree,” on the other hand, is one in which no evidence of paren *115 tal fitness is presented. Id. (citation omitted). In such a case, the heavy burden of proof rule enunciated in Bergeron does not apply. Silbernagel, supra, at 18. Rather, a party seeking a modification of a consent decree must prove that there has been a material change of circumstances since the original (or previous) custody decree was entered and that the proposed modification is in the best interest of the child. Id.
In this case, the parties executed a Consent Judgment which contained the following stipulation:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the parties hereto stipulate that the terms and conditions as contained within this “Consent Judgment ” shall have the legal effect of a “considered decree”, pursuant to the landmark Supreme Court case of Bergeron v. Bergeron, (emphasis in original).
The initial query here is what effect, if any, this stipulation has on the burden of proof required to make any modification to the agreement.
| inOne of the long-standing principles of Louisiana contract law is that “parties are free to contract for any object that is lawful, possible, and determined or determinable.” La. C.C. art. 1971. This “freedom of contract” signifies that parties to an agreement have the right and power to construct their own bargains. Family Care Serv., Inc. v. Owens, 45,505, p. 9 (La.App. 2 Cir. 8/11/10), 46 So.3d 284, 241. However, the state may “legitimately restrict the parties’ right to contract if the proposed bargain is found to have some deleterious effect on the public or to contravene some other matter of public policy.” Id. at 241-2. Whether or not parties can agree that their voluntary acquiescence to a custody agreement will be governed by the heightened Bergeron standard is a case of first impression for this Court. In fact, the Second Circuit is the only Louisiana appellate court to directly address the issue.[11]
In Adams v. Adams, 39,424, p. 1 (La.App. 2 Cir. 4/6/05), 899 So.2d 726, 727 the parties voluntarily executed a consent custody agreement which contained a provision that stated, “any action to modify custody would be governed by the heavy burden applicable to considered decrees as set forth in Bergeron v. Bergeron, 492 So.2d 1193 (La.1986).” The Second Circuit upheld the stipulation, stating that:
... the parties entered into a joint custody agreement which set forth the standard that would have to be met in order for their agreement to be modified. That agreement is the law between them. For their agreement to be deemed unenforceable, there must be some public policy consideration which is undermined by their stipulation regarding the burden of proof for modification. We can find no public policy reason to infringe on the freedom of contract in this instance. Id. at 730.
*116 In Judge Gaskins dissented from the majority, finding such stipulation contrary to public policy. There, she stated:
[w]hen the parties agree in their original consent judgment to have any subsequent modifications governed by the Bergeron standard, the opportunity for a judicial assessment of parental fitness and other significant factors is effectively negated. For the parties to skip over such an important step of impartial review-which has as its focus the best interest of the children-is against public policy. Id. at 782.
After Adams, the Second Circuit was again faced with a similar issue in Poole v. Poole, 41,220 (La.App. 2 Cir. 3/22/06), 926 So.2d 60.
In Poole, the custody trial had already commenced and evidence of parental fitness of one of the parties had been introduced. On the second day of trial, however, the parties voluntarily executed a custody agreement. In that case, the trial court determined that the agreement was a considered decree because the court had received evidence of parental fitness. On appeal, however, an en banc panel reversed that ruling. In reaching its decision, the Poole court examined Long v. Long, 28,768 (La.App. 2 Cir. 12/11/96), 684 So.2d 1099, wherein it upheld a stipulation that a consent judgment would be governed by Bergeron.
The Second Circuit distinguished Long from Poole noting that unlike the agreement in Long, the custody agreement in Poole contained no language that indicated “that the trial judge considered the evidence, nor that the parties agreed to impose a Bergeron standard for future litigation.” Poole, supra, at 63. The Poole court explained, “[ajpplying the Bergeron standard to a custody consent judgment in which some of the evidence has been presented, but not evaluated by the judge, would erode the definition of considered decree and the policy reasons for the rule as examined by the Bergeron court.” Id. (emphasis added).
11PIn the present case, the parties stipulated — without judicial assessment of parental fitness — that the custody agreement would be governed by the Bergeron standard. Bergeron, however, is triggered “[w]hen a trial court has made a considered decree of permanent custody.” Ber-geron, supra, at 1200 (emphasis added). The record in this case is void of any evidence that the Consent Judgment was executed with judicial assessment of parental fitness. Thus, to uphold the stipulation in this case would “erode the definition of considered decree and the policy reasons for the rule as examined by the Bergeron court.” Poole, supra, at 63.
Jennifer and Jonathan were afforded the opportunity to litigate to have a court make a judicial assessment of their parental fitness. Instead, they chose to circumvent this process and stipulated to Ber-geron. This Court is constrained from upholding such a stipulation. The heightened Bergeron standard was designed to “protect children from the detrimental effects of too liberal standards in custody change cases ...” Bergeron, supra, at 1200. Thus, parties cannot shield themselves from custody modifications by stipulating to Bergeron in cases where there has been no judicial assessment of parental fitness.
We, therefore, find that the March 14th agreement is a consent judgment not subject to Bergeron. Thus, Jennifer must show that a material change of circumstances has occurred since the rendition of the judgment. After a careful review of the record, however, we are unable to find that Jennifer has met this burden.
*117 The facts surrounding this case are upsetting. J.W. — at a very tender age — was, in fact, sexually abused. This young child was robbed of her innocence and will certainly be scarred by this for the remainder of her life. However, we cannot overlook the fact that there is no evidence in the record which suggests that |13Jonathan sexually abused J.W. In fact, the facts in the record suggest quite the opposite.
J.W. already had some vaginal discharge when Jennifer dropped her off with Jonathan for visitation. When the discharge did not clear up, Jonathan and his mother took JW. to the doctor. Jonathan then followed up with the doctor and with Jennifer to find out the results of J.W.’s test, to no avail. When Jonathan was finally notified by OCS that his daughter had gonorrhea, he immediately sought testing. The only evidence that would give indicia of any inappropriate touching is Jonathan’s own admission that he appropriately applied ointment to J.W. and the statement J.W. allegedly made to her mother that Jonathan stuck his finger inside her “pot-sy.” But as Dr. Steele opined, J.W. could have only contracted this disease by the male genitalia being next to or introduced into her vagina. Unfortunately, J.W. has yet to disclose the name of the person who made this contact.
Jennifer’s rule to modify custody was based upon J.W.’s positive test results for gonorrhea coupled with the allegation that Jonathan stuck his fingers up her “potsy.” A mere allegation of sexual abuse against a party — unsupported by the evidence — is insufficient to justify modification of a custody agreement. We therefore find that the trial judge erred in modifying custody in this case. We do find, however, as reflected in Dr. Klein’s report that the allegation of sexual abuse has severely strained the father-daughter relationship and that Jonathan and J.W.’s relationship requires rehabilitation.
Conclusion
For the reasons discussed, we amend the judgment as follows. We reverse the portion of the trial court’s judgment which designated Jennifer as the domiciliary parent and reinstate the March 14th Consent Judgment to the extent that |14it grants shared legal custody to both parents. We affirm that portion of the judgment which adopts Dr. Klein’s recommendation regarding gradual reinstatement of Jonathan’s visitation rights. As amended, the judgment is affirmed.

REVERSED IN PART; AFFIRMED IN PART.

JOHNSON, J., dissents, in part, with reasons.

. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986).

. The docket was initially styled Rodriguez v. Wyatt. During the course of the proceedings, Jennifer Rodriguez married and became Jennifer Weems.

. "MawMaw” is Ms. Martha Wyatt — J.W.'s paternal grandmother.

. J.W. referred to her vagina as "potsy.”

. Jennifer and her husband, Jody, were tested on January 6, 2009. Jennifer’s parents and siblings were tested on January 7, 2009, and her mother and father-in-law were tested on January 9, 2009.

. See La. Ch.C. art. 609-10.

. Although Jennifer testified that OCS advised her to suspend Jonathan's custodial periods, the record does not support that contention.

. Jonathan’s mother and her boyfriend also tested negatively for gonorrhea.

. Both the St. Charles Parish Sheriff’s Office (SCPSO) and the Jefferson Parish Sheriff’s Office (JPSO) were involved in the criminal investigation regarding J.W.’s sexual abuse. During the course of the investigation, SCPSO conducted a videotape interview of J.W. The parties sought production of that videotape. A portion of the 15-month delay between the interim judgment and commencement of trial can be attributed to litigation surrounding the production of the videotape. The court ultimately held, on August *113 27, 2009, that the tape could not be produced for in camera inspection. The remainder of the delay was due to various other motions filed during the course of the proceedings.

. Hope Bell is the clinical services coordinator with Child Advocacy Services who began counseling J.W., through play therapy, after she was diagnosed with gonorrhea.

. There are a line of Fourth Circuit cases that apply Bergeron to consent decrees. Those cases, however, are distinguishable from the present case. In those cases, the parties did not stipulate that their consent judgment would be governed by Bergeron. Rather, it appears that the Fourth Circuit indiscriminately treats consent decrees as considered decrees. See Monteleone v. Monteleone, 591 So.2d 1228 (La.App. 4 Cir.1991), Smith v. Smith, 559 So.2d 48 (La.App. 4 Cir.1990); Schultz v. Schultz, 553 So.2d 1010 (La.App. 4 Cir.1989); Nelson v. Nelson, 544 So.2d 1320 (La.App. 4 Cir.1989); Lauga v. Lauga, 537 So.2d 758 (La.App. 4 Cir.1989); Allen v. Allen, 533 So.2d 1068 (La.App. 4 Cir.1988), rev’d on other grounds, 536 So.2d 1227 (La.1989); Cf. Preau v. Preau, 499 So.2d 1270 (La.App. 4 Cir.1986); Lecount v. Lecount, 496 So.2d 1087 (La.App. 4 Cir.1986); Cherry v. Cherry, 04-0002 (La.App. 4 Cir. 2/2/05), 894 So.2d 1208.